O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| N.T.A.A. (NO TALK ALL ACTION), INC.; RYAN ROBINSON,<br><br>  Plaintiffs,<br><br>  vs.<br><br>NORDSTROM, INC.; NIKE, INC., and DOES 1 through 10, Inclusive<br><br>  Defendants.<br><br>―――――――――――――――<br>NIKE, INC.,<br><br>Counterclaimant,<br><br>v.<br><br>N.T.A.A. (NO TALK ALL ACTION), INC.; RYAN ROBINSON,<br><br>Counter-Defendants.<br>―――――――――――――――| ) Case No. 2:21-cv-00398 DDP-AGRx<br>)<br>)<br>)<br>)<br>) ORDER DENYING MOTION [83] FOR<br>) TERMINATING SANCTIONS AND<br>) ORDERING LESSER SANCTIONS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

1

Presently before the court is Nike's Motion for Terminating Sanctions (Dkt. 84). Having considered the parties' submissions and heard oral argument, the court adopts the following order.

## I. BACKGROUND

Plaintiffs Ryan Robinson and No Talk All Action ("NTAA") assert claims of Lanham Act trademark infringement and unfair competition, common law trademark infringement, and unfair competition under the California Business and Professions Code. (First Amended Complaint ("FAC") ¶ 46-87). Ryan Robinson is the founder and CEO of NTAA. (FAC ¶ 10). Plaintiffs claim that Defendants Nike and Nordstrom infringed on NTAA's stylized "N" design when they launched a "Nordstrom x Nike" collaboration in 2016. (FAC ¶ 36). To succeed in their suit, Plaintiffs must, among other things, establish trademark priority by proving that they sold products bearing their stylized "N" before the Nordstrom x Nike release in 2016.

Plaintiffs first posted the NTAA logo online on Facebook on April 11, 2015, promoting a film that NTAA produced. Duvdevani Decl. ISO Mot. ("Mot. Decl.") Ex. 13 (Dep. Ryan Robinson) 62:3-5; see Pittman Decl. ISO Opp. ("Opp. Decl.") Ex. 16. According to Plaintiffs, in 2015, Ryan Robinson traveled to New York, New Jersey, Pennsylvania, and Connecticut, where he solicited customers on sidewalks and made cash sales of NTAA-branded clothing. Dep. Ryan Robinson 83:4-14.[1] Robinson purportedly conducted these in-person sales primarily in New York, where he stayed with his cousin, Maurice Robinson, at 233 East 86th Street in Brooklyn. Dep. Ryan Robinson 286:20-287:15. Ryan[2] claims he used this apartment to receive shipments of NTAA merchandise. Dep. Ryan Robinson 287:23-288:1.

The remainder of the facts relevant to this motion occurred during discovery related to this litigation. To corroborate alleged in-person sales activity, Plaintiffs

---

[1] This in-person sales activity was not alleged in NTAA's amended complaint, which describes NTAA as an online business.

[2] Ryan Robinson and Maurice Robinson will be hereinafter referred to by first name where necessary to avoid confusion.

1   produced 19 invoices from UPS Store 138 in Toronto, from which Ryan's sister
2   purportedly mailed NTAA merchandise to Ryan in New York. Mot. Decl. Ex. 14. These
3   invoices, dated from April 4, 2015, to August 1, 2019, identify 233 East 86th Street as the
4   destination. Each invoice contains the Goods and Service Tax Identification Number
5   ("GST") 858532872.[3]

6   NTAA did not contemporaneously prepare or submit tax returns capturing its
7   sales activity from 2015 through 2022. Dep. Ryan Robinson 12:20-14:23. NTAA began
8   belatedly preparing its returns around March 2022, in response to Defendants' request
9   for production. Mot. Decl. Ex. 15 (Report of forensic accountant). Ryan did not provide
10  his accountant business records such as inventory records, bank statements, or a general
11  ledger. Dep. Ryan Robinson 21:20-22:18. Instead, he gave his accountant a profit and loss
12  statement he created in 2021. Id.

13  On August 29, 2022, Nike filed this Motion for Terminating Sanctions, alleging
14  Plaintiffs fabricated UPS invoices and tax returns. Mot. at 1. The Motion further alleges
15  that the receiving address on the UPS invoices was not the address of Maurice Robinson
16  and that Maurice Robinson never collected packages on behalf of NTAA. Mot. at 11. In
17  their Opposition, Plaintiffs reasserted trademark priority, citing to both previously
18  provided and new declarations and exhibits. Opp. at 16-18. Among Plaintiffs' newly-
19  proffered evidence of priority was a declaration of Clover Dallas, who echoed other
20  information that Ryan Robinson had provided in his deposition and discovery responses.
21  Namely, Dallas claimed to have worked on pressing, embroidery, engraving, and
22  packaging for NTAA since May 2015. See Opp. Decl. Ex. 10 (Decl. Clover Dallas, Aug. 18,
23  2022). She claimed she "was introduced to Mr. Robinson by an associate and client." Id.;

---

[3] A GST is a business identification number used by the Canada Revenue Agency. Each GST number is unique to the registered business owner.

see also Dep. Ryan Robinson 97:5-16. Annexed to the declaration was an identification document from 1977. Decl. Clover Dallas, Aug. 18 2022.

Nike had previously inquired about NTAA's printing vendor in its interrogatories, requesting "all information … relating to Colian Printing," including "any other relationship" with its owners or employees. Ryan responded to the interrogatory as follows:

> I do not know, but I believe it to be owned by Ms. Clover Dallas. Again, I am uncertain. Plaintiff is not aware of how long Colian Printing has been in business. Plaintiff's Business transactions with Colian Printing were (have been and are) as evidenced by the invoices provided by Colian Printing and produced to the Defendants in this action. Plaintiff has no other relationship with Colian Printing, Clover Dallas or any other person who is known to Plaintiff to be associated with Colian Printing, other than a business relationship reflected by the business identified in the receipts produced to Defendants.

Duvdevani Decl. ISO Reply ("Reply Decl.") Ex. 1 (Ryan Robinson's interrogatory responses).

After receiving Plaintiffs' opposition to the instant motion, with the above-described declaration of Clover Dallas, Nike began investigating Dallas, her business, and her relationship to Plaintiffs. Using information from social media and other sources, Nike concluded that Dallas is Ryan's mother. Despite previously disclaiming any non-business relationship with Dallas, Ryan thereafter conceded that she is, in fact, his mother. Decl. Ryan Robinson, October 11, 2022. Robinson continues to describe his relationship with his mother as "a business relationship…and not anything more." Id.

## II. LEGAL STANDARD

The actions underlying Nike's motion for sanctions all occurred during discovery. Thus, sanctions are available both under Federal Rule of Civil Procedure 37 and the court's "inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice." Leon v. IDX Sys. Corp., 464 F.3d 951, 958 (9th Cir. 2006) (quoting Anheuser–

Busch v. Natural Beverage Distribution, 69 F.3d 337, 348 (9th Cir. 1995)); Fed. R. Civ. P. 37(c) (allowing the court to impose sanctions on a party for failing to disclose, supplement an earlier response, or admit information). Dismissal under the court's inherent authority requires a finding of bad faith or willfulness. IDK Sys. Corp., 464 F.3d at 958. Dismissal under Rule 37 requires only a finding that the discovery violations were not caused by circumstances beyond the party's control. See Henry v. Gill Industries, Inc., 983 F.2d 943, 949 (9th Cir. 1993) (describing the test for "willfulness, bad faith, or fault necessary to justify dismissal") (internal quotation omitted). The power to issue terminating sanctions pursuant to either avenue is discretionary. See Craig v. Far West Engineering Co., 265 F.2d 251, 260 (9th Cir. 1959).

The court must consider the following factors before ordering dismissal: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." In evaluating the alleged misconduct, the district court may assess credibility and make factual findings. See Valley Engineers Inc. v. Elec. Eng'g Co., 158 F.3d 1051, 1055 (9th Cir. 1998). The Ninth Circuit has not ruled on the standard of proof that the moving party must satisfy, but the general consensus appears to be that the preponderance of the evidence standard applies. See WeRide Corp. v. Kun Huang, No. 5:18-CV-07233-EJD, 2020 WL 1967209, at *9 (N.D. Cal. Apr. 24, 2020) (collecting cases). This Court applies the preponderance of the evidence standard .

III. **DISCUSSION**

    A. **UPS INVOICES**

To investigate the authenticity of the 19 purported UPS invoices that Plaintiffs produced during discovery, Nike shipped a test package and obtained an invoice from UPS Store 138 on April 22, 2022. See Mot. Decl. Ex. 1. Nike also engaged an investigator

4

to analyze the 19 purported UPS invoices produced by Plaintiffs and compare them to the Nike's test invoice. Decl. Anthony Desarro ISO Mot. Nike engaged another investigator to examine the residence at 233 East 86th Street, which is the destination address on all 19 of Plaintiffs' purported invoices. Decl. Lois Colley ISO Mot. Based on these investigations, as well as the affidavit of its process server, Nike asserts that Plaintiffs used an "old invoice" from UPS Store 138 as a template to fabricate the 19 invoices Plaintiffs produced during discovery. Mot. at 8; Reply at 12-13. For the reasons set forth below, Nike has not established by a preponderance of the evidence that Plaintiffs fabricated the UPS Invoices.

### 1. GST discrepancy

Plaintiffs' 19 purported UPS Invoices contain the GST number of Timur Zhao, who owned UPS Store 138 until March 25, 2016. Decl. DeSarro. Nike's 2022 invoice, however, contains the GST number of Emily Sun, who has owned UPS Store 138 since September 20, 2017. Decl. DeSarro. Five of the UPS Invoices that Plaintiffs provided are dated after Emily Sun acquired the store from Timur Zhao, yet they still list Zhao's GST number. See Mot. Decl. Ex. 1. Nike argues that the only explanation for this discrepancy is that Plaintiffs used an "old invoice" from before the store changed ownership as a template to fabricate all of the invoices. Plaintiffs respond that the most likely explanation is that Emily Sun delayed in updating the GST number in Store 138's invoicing system. That is, Sun likely updated the GST number sometime after Plaintiffs' last invoice was created in 2019 and before Nike's test invoice was created in 2022.

Although Nike's GST number investigation raises serious questions as to the authenticity of the invoices, Nike has asked the court for the extraordinary remedy of terminating sanctions. Because of the seriousness of this request, evidence that corroborates Nike's theory is appropriate. Evidence about when Emily Sun updated the GST number in the UPS system would tend to prove that Plaintiffs did fabricate the

5

1   invoice. But Nike did not present such evidence, opting instead to put forth a possible,
2   but ultimately unsubstantiated, theory.[4] It is at least equally possible, however, that
3   Emily Sun was substantially tardy in updating the GST number, or that the old GST
4   remained on UPS invoices after the change in ownership for reasons other than Ryan's
5   perfidy. Therefore, Nike has not established to the court's satisfaction that the GST
6   discrepancy was the result of Plaintiffs' fabrications of evidence.

### 2. Calculation Error

The parties agree that the UPS Invoice to NTAA dated January 29, 2016, contains a calculation error. See Mot. Decl. Ex. 1. The line-item price is listed as $55.85, whereas the total price is listed as $55. See id. Nike's investigator concluded that only "a manual edit, modification, or manipulation of the numerical fields of the invoice or an error in the backend mathematical calculation code or formula" could account for this error. Decl. Anthony Desarro ISO Mot. Plaintiffs deny any manipulation of the invoice and suggest that whoever prepared the invoice at UPS committed human error. Opp. at 11. Nike argues that it "defies all logic" to suggest that UPS Store 138 manually calculated the invoice totals rather than utilize an automatic program. Reply at 12. Thus, according to Nike, "the only plausible explanation for this miscalculation on a computer-generated invoice is that Ryan Robinson manually altered this document." Reply at 12.

Nike may be correct that the invoices were computer-generated; however, as above, Nike failed to provide any evidence, beyond the existence of the calculation error itself, to connect the error with the conclusion that Ryan Robinson fabricated the invoice. Nike could have pinned down the source of the error through additional discovery, such as by interviewing UPS employees about whether they can manually edit invoices or whether there might be some legitimate reason that line item and total prices might

---

[4] At hearing, Nike explained that "by the time this started to unravel," they did not have enough time to depose witnesses at UPS Store 138 without requesting a discovery extension. Although this Court routinely grants discovery extensions for good cause, Nike never sought such an extension.

1 differ. The bald assertion that the only plausible explanation for the error is that Ryan
2 Robinson fabricated the invoice is not enough. Thus, Nike has not established by a
3 preponderance of the evidence that Plaintiffs manually entered the price on a fabricated
4 January 2016 invoice.

### 3. Maurice Robinson's Address

Nike also argues the destination address on the invoices does not match up with Plaintiffs' claims about the resident at that address. Mot. at 8. All of Plaintiffs' purported invoices contain the same destination address: 233 East 86th Street, Brooklyn, New York. See Mot. Decl. Ex. 1. Ryan Robinson previously testified that 233 East 86th Street was his cousin, Maurice Robinson's, address. Dep. Ryan Robinson 286:9-288:7. According to his deposition testimony, Ryan shipped packages of his NTAA merchandise to Maurice's address because Ryan stayed there when in New York for business. Id.[5] Ryan stated that Maurice still lived at 233 East 86th Street as of the time of Ryan's deposition in April 2022. Id. at 286:22.

Nike hired an investigator to look into Maurice Robinson's residential history. See Decl. Lois Colley ISO Mot. The investigator searched voter records, vehicle registrations, and other "public records and databases" for Maurice Robinson, turning up several addresses that were not 233 East 86th Street. Id. Nike also attempted to serve a subpoena on Maurice Robinson at 233 East 86th Street on April 22, 2022. Mot. Decl. Ex. 16. The process server did not encounter Maurice Robinson at that address, but spoke to "current resident Nevita," who claimed that she and her family had lived at the address "for years" and knew nothing of Maurice or Ryan Robinson. Id.

Eventually, Nike reached Maurice Robinson and he appeared for a deposition. See Mot. Decl. Ex. 19 (Dep. Maurice Robinson). Maurice confirmed that he resides at 1064

---

[5] Ryan also testified that he sometimes stayed at Airbnb properties in New York rather than Maurice's apartment. Dep. Ryan Robinson 288:2-11.

Willmohr Street in Brooklyn.[6] Id. at 18:3-6. However, Maurice also stated he "go[es] back and forth" between his apartment and 233 East 86th Street, where his girlfriend and his daughter live. Id. at 25:15-19. Maurice gave evasive answers throughout his deposition, including repeatedly claiming not to recall how long he has lived on Willmohr Street. See id. at 18:21-20:17. In response to Nike's questioning, Maurice intimated that he felt Nike was "starting to investigate [Maurice] for some reason," even though Maurice has "nothing to do with this [lawsuit]." Id. at 20:10-17. He alternatively claimed to never have received packages for Ryan Robinson and that he could not recall whether he received packages for Ryan Robinson. See, e.g., id. at 29:22-30:25.

Nike argues that Maurice's testimony, the presence of someone named Nevita at the 86th Street address, and the investigator's database searches prove that Plaintiffs fabricated evidence and gave false testimony about shipping NTAA merchandise to the 86th Street address. Mot. at 11. Plaintiffs respond that Ryan merely mistook the address to be Maurice's address because Maurice was staying there with his girlfriend and daughter. See Opp. at 12; Decl. Ryan Robinson Sept. 23, 2022.

Nike has not established by a preponderance of the evidence that Plaintiffs fabricated the address on the 19 UPS invoices and gave false testimony about the 86th Street apartment. First, Nike's process server's affidavit of nonservice is not admissible evidence that Maurice could never have received packages at East 86th Street. Rather, the affidavit contains hearsay statements from "current resident Nevita" to the process server about the address and its residents. Mot. Decl. Ex. 16. There is no hearsay rule exception that would admit these out of court statements. Nike has not produced any admissible evidence that someone unconnected to Maurice has resided at 233 East 86th Street for the entire period in question. See Decl. Lois Colley ISO Mot.

---

[6] Nike managed to reach Maurice Robinson after sending the subpoena by mail, email, text, and a posted notice on his door at his Willmohr Street residence. Mot. Decl. Ex. 19; Mot. at 10 n.3.

8

1    As for Maurice's testimony that he did not recall whether he received any
2  packages for Ryan at 233 East 86th Street, these responses must be viewed in the context
3  of Maurice's perfunctory answers to many of Nike's questions. Maurice responded to
4  Nike's questions as follows:

> Q. Did you ever receive any packages that were sent to 1064 Willmohr Street for Ryan Robinson?
> A: No. No.
> Q: How about at East 93rd Street?
> A: I cannot recall.
> Q: Do you ever recall seeing any packages with Ryan Robinson's name on it since you've been in Brooklyn?
> A: I cannot recall.

5   Dep. Maurice Robinson 29:35-30:8. Maurice stated that he felt he was under investigation
6  and evinced a clear desire to stay out of Ryan's affairs. See, e.g., id. at 29:1-30:21
7  (repeating "I don't want to say" and "I can't recall" when asked about Ryan's business).
8  Because Maurice's testimony is sparse and contradictory about his knowledge of
9  packages shipped to the 86th street residence, Nike has not shown by a preponderance of
10 the evidence that Plaintiffs falsified invoices and testimony about the 86th Street
11 residence.

12               4.    Formatting Discrepancies

13   Finally, Nike points out various formatting inconsistencies between the invoice
14 Nike obtained in 2022 and the 19 purported invoices that Plaintiffs produced. Namely:
15 the dates are in a different format, there is a missing unit price on Plaintiffs' Invoices, the
16 "bill to" and "pay to" fields are transposed between the two sets of invoices, the phone
17 numbers on the header differ, and the fonts are distinct. Mot. at 6; Decl. David
18 Lafontaine. It is unclear how these formatting discrepancies fit into Nike's theory that
19 Plaintiffs used an "old invoice" as a template. Nike failed to provide evidence supporting
20 its theory, such as a copy of an old invoice from the UPS store or testimony about when
21 the formatting of the store's invoices changed from that seen on Plaintiffs' 19 purported

invoices to that seen on Nike's 2022 invoice. It is plausible that the formatting changed sometime after Plaintiffs' last invoice in 2019 and before Nike's 2022 invoice. Thus, Nike did not meet its burden to connect the formatting discrepancies with Nike's theory of Plaintiffs' alleged fabrication.

### 5. UPS Invoices Conclusion

To support the claim that Plaintiffs fabricated UPS invoices by copying an old template invoice and manually changing the dates and totals, Nike points to the GST number discrepancy, the calculation error, the address at which Maurice never resided full-time, and the formatting discrepancies between recent and old invoices. But, despite Nike's contention, none of these four discrepancies establish by a preponderance of the evidence that Plaintiffs fabricated evidence or gave false testimony. Without such proof of Plaintiffs' culpability, this Court cannot order terminating sanctions for the alleged doctoring of the UPS invoices.

### B. TAX RETURNS

Ryan Robinson freely admits that he began preparing NTAA's 2015 through 2022 tax returns only recently, in response to this litigation. Dep. Ryan Robinson 12:20-14:23. He further admits that he provided his tax preparer a profit and loss statement created in 2021, also in response to this litigation. Id. At his deposition, Robinson stated that he was the sole owner of NTAA shares, and he was not issued any shares by NTAA until 2021. Dep. Ryan Robinson 173:17. The submitted tax returns, however, reflect 100 outstanding shares each year from 2016-2020. See Mot. Decl. Ex. 15 (Forensic Accounting Report of Philip Green). Based on the discrepancy between Robinson's testimony and NTAA's tax returns, Nike argues that Robinson included false information on NTAA's tax returns. Mot. at 15, 22. Further, Nike argues that the fact that the tax returns were created only in response to this litigation, without any contemporaneous business records to corroborate amounts, is "quintessential fabrication." Reply at 17.

1  According to Nike, because these tax returns are "key" to Plaintiffs' ability to
2  prove priority, their fabrication constitutes discovery misconduct and is cause for
3  terminating sanctions. Mot. at 23. But contrary to Nike's assertions, this case is not
4  analogous to AECOM Energy, in which defendants were sanctioned for repeatedly
5  refusing to turn over financial records. See AECOM Energy & Constr., Inc., v.
6  Topolewski, 2022 WL 595937 (C.D. Cal. Feb. 25, 2022). In AECOM, the plaintiffs sought
7  terminating sanctions because they could not prove damages without the defendants'
8  financial records. Id. The defendants' steadfast refusal to provide those documents
9  prevented the plaintiffs from proceeding with their case. Id. Without any reliable
10 documents, the court entered a default judgment against defendants rather than allow
11 defendants to obfuscate their way out of paying damages. Id.

12 Here, NTAA's belated and uncorroborated tax returns do not reflect best business
13 practices. But, unlike in AECOM, Plaintiffs' failure to produce reliable tax returns here
14 does not prevent Nike from prevailing on any particular issue. To the contrary, Plaintiffs'
15 reliance on documents of dubious accuracy may jeopardize their ability to establish, or to
16 show a genuine dispute of material fact as to, priority of use. At trial, Plaintiffs will not be
17 able to rely on any business records that they did not produce during discovery. Thus,
18 terminating sanctions are an unnecessary and inappropriate remedy here for tax returns
19 that were created in response to litigation.

20     **C.**     **CLOVER DALLAS**

21 In their initial response to Nike's accusation that Ryan Robinson concealed that
22 Clover Dallas was his mother, Plaintiffs submitted a declaration of Ryan Robinson,
23 wherein Robinson conceded that Dallas is indeed his mother. Decl. Ryan Robinson, Oct.
24 11, 2022. But instead of admitting that he had previously made a material
25 misrepresentation when he stated he was only introduced to Dallas via his associate,
26 Robinson maintained that he was referred to Colian printing from a Mr. Mahmood,
27 whom he "met on the street in Toronto." Id. He did not explain how it would be possible

11

that Mr. Mahmood, a relative stranger, would have referred Ryan Robinson to his own mother. Ryan Robinson doubled down on his earlier claims that he had "only a business relationship" with Dallas "and not anything more." Id.; Reply Decl. Ex. 2. Plaintiffs also submitted a second declaration of Dallas, in which Dallas again claimed that she was "introduced to Ryan Robinson's business venture by an associate and client, Mr. Mahmood." Decl. Clover Dallas, Oct. 7, 2022.

At the hearing on Nike's motion for sanctions, Plaintiff's counsel did not dispute that Robinson falsely denied any relationship to Dallas. It is indisputable that Dallas being Robinson's mother was within the scope of Nike's Interrogatory No. 18., which called for "all information…relating to any other relationship" Robinson "*had* or [has]" with Dallas. Reply Decl. Ex. 2, Response to Interrogatories (emphasis added). Though Dallas and Robinson maintained in their declarations that they *have* nothing other than a business relationship, their past relationship was within the bounds of the interrogatory. Cf. Feliciano v. City of Miami Beach, 2012 U.S. Dist. LEXIS 202952 (Feb. 10, 2012) (denying sanctions where the omitted information was outside the scope of an interrogatory). Further, Robinson had ample opportunity to clarify his relationship to Dallas at his deposition, when Nike asked at length about Dallas and Colian Printing. See Dep. Ryan Robinson at 284. It is unclear whether Plaintiffs would ever have acknowledged this relationship had Nike not brought it to light in the instant motion.

Despite Plaintiffs' argument that Robinson's relationship with Dallas is a collateral issue,[7] Robinson's relationship with Dallas is significant to Plaintiffs' ability to prove sale of NTAA-branded products during the priority period. Plaintiffs themselves averred that Dallas' first declaration "proves that since February 2014, Plaintiff has purchased clothes and had his "N" mark applied to them for [sale] to customers." Opp. at 17. Were Plaintiffs to use Dallas' testimony at trial, Nike would be able to impeach Dallas'

---

[7] See transcript of hearing, Oct. 31, 2022, at 51:1.

credibility by arguing she is biased in favor of her son. Plaintiffs likely sought to preclude this argument by concealing Robinson and Dallas' relationship. Insofar as Ryan Robinson's relationship with Dallas undercuts the credibility of Plaintiffs' proffered evidence of priority, it is not a collateral matter. Moreover, given Plaintiffs' admissions, there is no question that Nike met its burden to show by a preponderance of the evidence that Plaintiffs misled by omission regarding Clover Dallas and Colian Printing.

### D. LESSER SANCTIONS

The court has discretion to order terminating sanctions under Federal Rule of Civil Procedure 37(b)(2). See Valley Eng'rs, 158 F.3d at 1056. Plaintiffs' own admissions establish that Robinson misled by omission in his deposition and response to interrogatories. This deception was compounded by the introduction of a declaration by Clover Dallas in response to Nike's motion for sanctions, repeating the false statement that Dallas was introduced to Robinson by a man Robinson met on the street. As discussed above, Dallas' relationship to Robinson is central to the credibility of her testimony.

On the other hand, as discussed above, Nike has not established by a preponderance of the evidence that Plaintiffs' UPS receipts and tax returns are fraudulent. The court finds that Plaintiffs' deception about Clover Dallas, alone, does not rise to the level of terminating sanctions. First, this case is unlike Nike's cited cases, in which the deceiving party was repeatedly warned that terminating sanctions would issue upon any further abuses. See, e.g., Sun World, Inc., v. Olivarria, 144 F.R.D. 384, 391 (E.D. Cal. 1992). Second, the court disagrees with Nike's argument that "the prejudice to Nike could not possibly be more acute." See Motion at 19; cf. AECOM Energy & Constr., Inc., v. Topolewski, 2022 WL 595937 (C.D. Cal. Feb. 25, 2022) (noting that Plaintiffs were severely prejudiced by Defendants misconduct, because Defendants' obfuscation prevented Plaintiffs from calculating damages). In this case, any prejudice to Nike is

tempered by the fact that it will be Plaintiffs' burden, at the summary judgment stage, to establish their case beyond a genuine dispute of material fact.

Accordingly, the court finds the following sanctions more appropriate: Plaintiffs are ordered to pay Nike's reasonable attorney's fees in connection with the investigation of Clover Dallas. Nike shall submit a supplemental declaration breaking out and itemizing any such expenses. This shall not include fees for the investigation of the UPS invoices and tax returns, as Nike has failed at this time to establish Plaintiffs fabricated evidence or gave false testimony as to those issues.

## IV.  CONCLUSION

Because Nike asserted Plaintiffs' lack of priority as an affirmative defense in its answer, Plaintiffs will need to establish at least a genuine dispute of material fact regarding their priority use of the specialized "N" in order to survive summary judgment. But unlike summary judgment, an order granting terminating sanctions here requires the court to find that Nike has established by at least a preponderance of the evidence that Plaintiffs engaged in willful discovery misconduct. Because Nike has not met that burden, its motion for terminating sanctions is DENIED. Instead, the court orders the lesser sanctions detailed above.

**IT IS SO ORDERED.**

Dated: February 10, 2023

_____
Hon. Dean D. Pregerson